1   **ROSMAN & GERMAIN LLP**
    Daniel L. Germain (Bar No. 143334)
2   16311 Ventura Boulevard, Suite 1200
    Encino, CA 91436-2152
3   Telephone: (818) 788-0877
    Facsimile: (818) 788-0885
4
    **KESSLER TOPAZ**
5     **MELTZER & CHECK, LLP**
    Eric L. Zagar (Bar No. 250519)
6   Robin Winchester
    Matthew A. Goldstein
7   280 King of Prussia Road
    Radnor, PA 19087
8   Telephone: (610) 667-7706
    Facsimile: (610) 667-7056
9
    *Counsel for Plaintiff*
10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13  ERIE COUNTY EMPLOYEES'
    RETIREMENT SYSTEM, Derivatively      Case No.
14  on Behalf of Nominal Defendant IXIA,

15                     Plaintiff,        **CV14-3468**ABL-Ex

16          v.                           **VERIFIED SHAREHOLDER**
                                         **DERIVATIVE COMPLAINT**
17  VICTOR ALSTON, ERROL
    GINSBERG, LAURENT ASSCHER,           **JURY TRIAL DEMANDED**
18  JONATHAN FRAM, GAIL
    HAMILTON, JON RAGER, ATUL
19  BHATNAGAR, and THOMAS B.
    MILLER,
20
                     Defendants,
21
            and
22
    IXIA,
23
                     Nominal Defendant.
24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Erie County Employees' Retirement System ("Plaintiff"), by its undersigned attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of nominal defendant Ixia (or the "Company") against certain current and former members of its Board of Directors (the "Board") and certain of the Company's current and former executive officers seeking to remedy defendants' breaches of fiduciary duties.  Plaintiff, by the undersigned attorneys, alleges upon personal knowledge with respect to itself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein.

2.     This action concerns the Individual Defendants' (as defined herein) breaches of fiduciary duties in connection with the issuance of years of materially false and misleading statements concerning, *inter alia*, the Company's improperly recognizing revenues related to its warranty and software maintenance contracts, the misstatement of the Company's Chief Executive Officer's ("CEO") academic credentials and employment history, and the adequacy of the Company's internal controls over financial reporting.

3.     On March 19, 2013, Ixia filed with the Securities and Exchange Commission ("SEC") a Form 12b-25 disclosing that the Company needed "to correct an error related to the manner in which it recognizes revenues for its warranty and software maintenance contracts, and therefore requires additional time to complete its consolidated financial statements as of and for the three years ended December 31, 2012 and an assessment of its internal controls over financial reporting as of December 31, 2012."

4.     On April 3, 2013, Ixia announced that after evaluating its finances, the Company's management recommended to the Audit Committee of the Board that the

Company restate its consolidated financial statements for: (i) the fiscal years ended December 31, 2011 and 2010; (ii) the fiscal quarters ended March 31, 2011, June 30, 2011, September 30, 2011 and December 31, 2011; and (iii) the fiscal quarters ended March 31, 2012, June 30, 2012 and September 30, 2012.

5. To make matters worse, on October 24, 2013, Ixia filed with the SEC a Form 8-K stating:

> Victor Alston, President Chief Executive Officer of the Company, resigned as president and chief and executive officer of the Company following a determination by the Ixia audit committee that although he had attended Stanford University, he had misstated his academic credentials, incorrectly claiming to have received a B.S and a M.S. in Computer Science, and had misstated his age and early employment history. Mr. Alston also resigned from the Company's board of directors.

6. On April 17, 2014, the Company disclosed that "management and the Audit Committee concluded that the Company's previously issued condensed consolidated financial statements contained in its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2013 and June 30, 2013 should no longer be relied upon, and should be restated" due to certain accounting errors.  The Company went on to state that "[t]he correction of the errors is expected to reduce total revenues by approximately $2.0 million and $4.5 million for the quarters ended March 31, 2013 and June 30, 2013, respectively" and "the correction of the errors is expected to increase deferred revenues by approximately $2.0 million and $6.5 million as of March 31, 2013 and June 30, 2013, respectively."

7. As a result of the Individual Defendants' misconduct, Ixia has sustained significant damages, including, but not limited to, costs incurred in connection with the investigation and remediation of the Company's inadequate internal controls and the multi-year restatement of its historical financial statements.

**JURISDICTION AND VENUE**

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).   This action is not a collusive action designed to confer jurisdiction on a court of the United States which it would not otherwise have.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because nominal defendant Ixia is headquartered in this District.   In addition, a substantial portion of the occurrences complained of herein occurred in this District and one or more of the Defendants either resides in, or maintains offices in, this District.

**PARTIES**

10.     Plaintiff is a stockholder of Ixia, was a stockholder of Ixia at the time of the wrongdoing alleged herein, and has been a stockholder of Ixia continuously since that time.   Plaintiff and all the board members of Plaintiff are citizens of the Commonwealth of Pennsylvania.

11.     Nominal defendant Ixia is a California corporation with its principal place of business located at 26601 W. Agoura Road, Calabasas, California 91302. According to its public filings, Ixia is a leading provider of converged Internet Protocol network validation and network visibility solutions.   Shares of Ixia's common stock are traded on NASDAQ under the ticker symbol "XXIA."

12.     Defendant Victor Alston ("Alston") served as Ixia's President, CEO and a director from May 2012 until his resignation on October 24, 2013.   He joined the Company as Vice President, Application Development in August 2004.   Defendant Alston became Vice President, Engineering in April 2006 and was appointed as an executive officer in that position in June 2006.   He served as Senior Vice President, Product Development from June 2007 until March 2012, and as Chief Operating

Officer from March 2012 until May 2012 when he assumed the positions of President and CEO.  Upon information and belief, defendant Alston is a citizen of the State of California.

13.     Defendant Errol Ginsberg ("Ginsberg") has served as Ixia's interim CEO since October 24, 2013, as Ixia's Chairman of the Board since January 2008 and as Ixia's Chief Innovation Officer since March 2008.  He has served as a director of Ixia since May 1997.  Defendant Ginsberg served as Ixia's CEO from September 2000 to March 2008, and as President from June 1997 to September 2007.  Defendant Ginsberg served as Chairman of the Strategic Planning Committee from at least 2009 to March 2011.  Upon information and belief, defendant Ginsberg is a citizen of the State of California.

14.     Defendant Laurent Asscher ("Asscher") has served as a director of Ixia since October 2008.  He has served as a member of the Compensation Committee since at least April 2009 and has served as a member of the Audit Committee since June 2013.   Defendant Asscher served as a member of the Strategic Planning Committee from at least 2009 to March 2011.   Upon information and belief, defendant Asscher is a citizen of Belgium.

15.     Defendant Jonathan Fram ("Fram") has served as a director of Ixia since July 2005.  He has served as a member of the Audit and Compensation Committees since at least April 2009, and as Chairman of the Audit Committee since June 2013.  Defendant Fram has also served as Chairman of the Nominating and Corporate Governance Committee since at least April 2009.  He served as a member of the Strategic Planning Committee from at least 2009 to March 2011.  Upon information and belief, defendant Fram is a citizen of the State of California.

16.     Defendant Gail Hamilton ("Hamilton") has served as a director of Ixia since July 2005.  She has served as a member of the Audit and Nominating and Corporate Governance Committees and as Chairwoman of the Compensation Committee since at least April 2009.  Defendant Hamilton served as a member of the

Strategic Planning Committee from at least 2009 to March 2011.  Upon information and belief, defendant Hamilton is a citizen of the State of Texas.

17.    Defendant Jon Rager ("Rager") served as a director of Ixia from May 1997 until his retirement from the Board on June 19, 2013.  He served as Ixia's Chief Financial Officer ("CFO") from June 1997 to March 2000.  Defendant Rager served as Chairman of the Audit Committee and as a member of the Nominating and Corporate Governance Committee from at least April 2009 to June 2013.  He served as a member of the Compensation Committee from at least April 2009 to May 2011 and as a member of the Strategic Planning Committee from at least 2009 to March 2011.  According to the Company's public filings, defendant Rager qualified as an "Audit Committee financial expert" during his tenure on the Board.  Upon information and belief, defendant Rager is a citizen of the State of California.

18.    Defendant Atul Bhatnagar ("Bhatnagar") served as Ixia's President, CEO and a director from March 2008 to May 2012.  He joined the Company as President, Chief Operating Officer and a director in September 2007.  Upon information and belief, defendant Bhatnagar is a citizen of the State of California.

19.    Defendant Thomas B. Miller ("Miller") served as Ixia's CFO from March 2000 until his resignation in March 2014.  Upon information and belief, defendant Miller is a citizen of the State of California.

20.    The defendants listed in paragraphs 12 to 19 may be referred to collectively herein as the "Individual Defendants."  Unless otherwise indicated, the term "Audit Committee Defendants" refers to defendants Asscher, Fram, Hamilton and Rager.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### *The Individual Defendants' Fiduciary Duties*

21.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the

fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

22.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

23.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of the Company were required to, among other thing:

    a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of their business;

    b.    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.    Exercise good faith to ensure that the statements made to the public by the Individual Defendants, through the Company, were not materially false and/or misleading.

### Additional Duties of the Audit Committee Defendants

24.    In addition to their duties as Board members, the Audit Committee Defendants had certain duties by virtue of their positions on the Audit Committee. These duties are set forth in the Audit Committee Charter.

25.     According to the Audit Committee Charter, the Audit Committee's purpose is, *inter alia*, to assist the Board in overseeing and monitoring:

(i)     the qualifications, independence and performance of the Company's independent registered public account firm (the "Auditors") to perform the annual audit and quarterly reviews of the Company's financial statements, as well as monitoring and evaluating the Auditors' performance;

(ii)    the integrity of the Company's financial statements, and the Company's accounting and financial reporting processes, systems of disclosure controls and procedures and internal controls over financial reporting; and

(iii)   compliance with legal and regulatory requirements.

The Audit Committee Charter further provides that the Audit Committee will:

*Independent Auditors*

1)      Be directly responsible and have sole authority for the selection, appointment, compensation, evaluation, retention and oversight of the work performed by the Auditors. The Auditors shall report directly to the Committee. The Committee will oversee the resolution of any disagreements between management and the Auditors regarding financial reporting;

2)      Approve in advance all auditing services and permissible non-audit services by the Auditors. The Committee may delegate to the Committee Chair the authority to pre-approve the Auditors' services, provided that the Chair's decisions and the approved terms and conditions are presented to the full Committee no later than at its next regularly scheduled meeting. As a condition of approval, all non-audit services shall not, in the judgment of Committee (or the Committee Chair, where applicable), adversely impact the independence and objectivity of the Auditors;

3)      Monitor management's compliance with the governing laws and regulations with respect to the hiring of employees or former employees of the Auditors;

4)      Annually evaluate the Auditors' independence and present the Committee's conclusions to the full Board. As part of such evaluation, the Committee shall:

a)      receive the written disclosures and letter from the Auditors required by the Public Company Accounting Oversight Board ("PCAOB") Rule 3526 ("Communication with the Audit Committee Concerning Independence") regarding any relationships between the Auditors and the Company, and actively engage in dialogue with the Auditors regarding any disclosed relationships or services that may impact the Auditors' objectivity and independence;

b)     assure that the Auditors have in place a process for the regular rotation of the lead and concurring audit partners in accordance with the rules of the SEC; and

c)     consider whether the Auditors' provision of permissible non-audit services is compatible with the Auditors' independence;

5)     Annually evaluate the qualifications and performance of the Auditors to determine whether they should be reappointed or replaced. The Committee's evaluation shall include:

a)     a review of the Auditors' lead partner; and

b)     confirmation that the Auditors are registered with the PCAOB;

6)     Meet with the Auditors and the Company's financial management to review the proposed scope of the annual audit, the proposed scope of the quarterly reviews, and the engagement letter(s) covering all services to be provided by the Auditors;

*Financial Statements*

7)     Review and discuss with the Auditors:

a)     reports of all critical accounting policies used in preparing the Company's financial statements;

b)     reports of all alternative treatments of financial information within accounting principles generally accepted in the United States of America ("GAAP") that have been discussed with management, ramifications of the use of such alternative principles, and the GAAP alternative preferred by the Auditors; and

c)     other material written communications between the Auditors and management, such as

(i)     the representation letters from management regarding its responsibilities and its review of the summary of aggregated differences, if any;

(ii)     reports on observations and recommendations on accounting, auditing, internal controls, and/or operational matters;

(iii)     schedules of material adjustments and reclassifications proposed; and

(iv)     a listing of adjustments and reclassifications not recorded, if any;

8)     Review and discuss with the Auditors any audit problems or difficulties that they encountered during the annual audit or

quarterly review services, including any restrictions imposed on the scope of their services, difficulties obtaining required information, any significant disagreement with management, any significant changes in the planned scope of services because of concerns or difficulties, significant audit adjustments and any other matters required to be discussed by the auditing standards promulgated by the PCAOB;

9)   Review and discuss with management, at least quarterly, significant issues, estimates, and judgments that may have a material impact on the Company's financial statements or internal controls, or that may be a matter of public interest or disclosure;

10)   Meet with the Company's management and Auditors to review and discuss the audited financial statements contained in the Company's Annual Report on Form 10-K (the "Form 10-K") and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" (the "MD&A") prior to the Company's filing of such Form 10-K or release of the Company's financial results. Discuss any significant financial judgments made in connection with the preparation of such financial statements. Receive assurances from the Company's financial management that the financial statements proposed to be included in the Company's Annual Report contain no material misstatements. Receive assurances from the Auditors that they have read the other information proposed to be included in the Form 10-K and have considered whether such information, or the manner of its presentation, is materially consistent with information, or the manner of its presentation, appearing in the financial statements. Recommend to the Board whether the financial statements should be included in the Form 10-K;

11)   Meet with the Company's management and Auditors to review and discuss the financial statements contained in the Company's Quarterly Reports on Form 10-Q (the "Form 10-Q") and the Company's disclosures in the MD&A prior to the Company's filing of a Form 10-Q. Receive assurances from the Company's financial management that the financial statements included in the Company's Form 10-Qs do not contain any material misstatements and review the summary of aggregated differences, if any, for the quarter. Receive assurances from the Auditors that, in the course of their review procedures, they did not become aware of any material modification that should be made to the interim financial statements in order for them to conform with GAAP;

12)   Monitor the operation of the Company's Disclosure Committee by inquiring, prior to the Company's filing with the SEC of its annual and quarterly reports, about the matters discussed and conclusions reached in that Committee's meetings held in connection with the preparation of such reports and inquiring about the adequacy of the disclosures in such reports, including regarding any significant related party transactions or any other potential conflict of interests situations involving a principal

shareholder, a member of the Board or senior management, and any off-balance sheet transactions;

*Internal and Disclosure Controls*

13)  Discuss quarterly with the Chief Executive Officer and the Chief Financial Officer management's conclusions about the effectiveness of the Company's internal controls over financial reporting and any significant changes or any significant deficiencies noted with respect to such internal controls;

14)  Review and discuss at least annually with the Auditors and financial management the adequacy and effectiveness of the Company's internal controls over financial reporting, including any significant changes in internal controls and the status of corrective actions taken, or to be taken, in order to remediate all significant deficiencies and material weaknesses identified during the course of management's and the Auditors' testing of the internal controls. Review the management letters issued by the Auditors recommending improvements in accounting procedures and/or internal controls, and management's responses thereto. Periodically assess any action that management has taken or progress it has made in addressing issues, if any, raised by the Auditors;

15)  Review and discuss with management, prior to release, the Company's earnings press releases (including any non-GAAP financial measures therein) and any financial information and earnings guidance to be provided to analysts or posted on the Company's web site upon or after publication of the press releases;

16)  Periodically discuss with management and the Auditors the effect of regulatory and accounting developments and off-balance sheet structures, if any, on the Company's financial statements;

*Other Responsibilities*

17)  Annually review with senior financial management and the Auditors the responsibilities, budget organization, staffing and quality of personnel of the Company's financial and accounting department;

18)  Annually receive a report from the Chief Financial Officer and/or the Director, Information Technology, about the adequacy and security of the Company's computerized information and accounting systems and related internal controls;

19)  Annually receive a report from the Company's director of corporate income taxes regarding significant income tax matters, including accounting for uncertain tax positions and unrealized tax benefits and the status of any governmental tax audits;

20)  Annually receive a report from the Company's Chief Executive Officer and Chief Financial Officer reviewing the Company's

policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and steps taken to monitor and mitigate such exposures;

21) Annually review the Company's Business Ethics Policy and ensure that management has established a system to enforce and monitor compliance with the Policy;

22) Oversee compliance with the Company's Code of Ethics for Chief Executive Officer and Senior Financial Officers;

23) Discuss at least annually with the Company's legal counsel the effectiveness of the Company's legal compliance programs, any legal matters that may have a material impact on the Company's financial statements and any material reports or inquiries received from regulators or governmental agencies;

24) Authorize and oversee investigations deemed appropriate by the Board into any matters within the scope of the Committee's roles and responsibilities;

25) Review and approve the report of the Committee that the SEC requires be included in the Company's annual proxy statement;

26) Review and approve all related party transactions, which are those transactions required to be disclosed pursuant to Item 404 of SEC Regulation S-K;

27) Establish and follow procedures for the receipt, retention and treatment of any complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters;

28) Report regularly to the Board on the Committee's activities and the performance of its roles and responsibilities and present to the Board any recommendations that the Committee deems appropriate;

29) Annually review this Charter and recommend any proposed changes to the Board for its approval. Annually conduct a self-evaluation of the Committee's performance of its roles and responsibilities and report thereon to the Board;

30) Engage in any other activities or perform any other duties consistent with this Charter, the Company's bylaws or governing laws that the Board or the Committee determines are necessary or appropriate.

## **SUBSTANTIVE ALLEGATIONS**

26. According to its filings with the SEC, Ixia has historically engaged in the following revenue recognition practices:

(i)    the Company has commenced the recognition of revenue in the first calendar month following the effective date of the contract as though the warranty and maintenance period commenced on the first day of such month; and

(ii)   the Company has recognized revenue associated with back maintenance fees (i.e., fees related to a lapsed period of warranty and software maintenance coverage) over the term of the renewed warranty and software maintenance contract commencing in the first calendar month following the effective date of the contract as though the warranty and maintenance period commenced on the first day of such month.

27.    Ixia belatedly determined that it needed to correct an error related to the manner in which it recognized revenues for its warranty and software maintenance contracts, resulting in a shift of revenues between accounting periods from previously issued financial statements. The Company estimated that correcting for the "implied arrangement error" in the Company's revenue recognition practices would move to prior years the recognition of approximately $4.15 million of a $4.9 million amount that the Company had previously expected to include in the first quarter of 2013. In assessing its improper revenue recognition practices, Ixia determined the following:

(i)    it was instead required to begin recognizing such revenues on the effective date of each such contract. In addition, when customers entered into warranty and software maintenance contracts after the start of the applicable warranty periods, the Company recognized revenues ratably over the remaining term of the warranty period commencing on the first day of the calendar month following the effective date of the contract. The Company has determined that it was instead required to recognize when invoiced the revenues allocable to that portion of the warranty period preceding the evidence of arrangement date (i.e., "back maintenance fees") and to recognize the remaining revenues ratably over the remainder of the warranty contract period; and

(ii)   [it] determined that it was required to cease to defer revenues related to the implied warranty and software maintenance arrangement upon the receipt from the customer of the first substantive contract for extended warranty and software maintenance services, and will recognize the applicable previously deferred revenues balance related to the implied arrangement, provided all other revenue recognition criteria have been met.

28.    On April 3, 2013, Ixia announced that after further evaluation of the Company's revenue recognition practices, it needed to restate its consolidated financial statements for: (i) the fiscal years ended December 31, 2011 and 2010; (ii) the fiscal quarters ended March 31, 2011, June 30, 2011, September 30, 2011 and December 31, 2011; and (iii) the fiscal quarters ended March 31, 2012, June 30, 2012 and September 30, 2012.  Furthermore, the Company acknowledged that such restatements were necessary in order to correct the admittedly ineffective internal controls over financial reporting as of December 31, 2012:

> [T]he Company did not maintain effective disclosure controls and procedures and internal control over financial reporting as of December 31, 2012 because of the identified material weaknesses related to the accuracy with which the Company had historically recognized revenues related to its warranty and software maintenance contracts and arrangements. Specifically, the Company did not design a control to compute and assess the significance of the difference between its revenue recognition practices related to the Company's warranty and software maintenance contracts and the revenues that would have been recognized using the appropriate accounting principles generally accepted in the United States of America. The Company also did not design a control to review changes to its previous implied warranty and software maintenance arrangement with one of its customers to properly determine the impact of revenue recognition when the implied arrangement ceased to exist.

29.    On April 4, 2013, the Company filed with the SEC a Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K"), in which it amended or restated the following types of financial information for the periods noted in the table below:

| Type of Financial Information | Date or Period |
|---|---|
| Consolidated balance sheet | As of December 31, 2011 |
| Consolidated statements of operations, comprehensive income, shareholders' equity, and cash flows | Years ended December 31, 2011 and 2010 |
| Selected financial data | Years ended and as of December 31, 2011, 2010, 2009 (Unaudited) and 2008 (Unaudited) |
| Unaudited quarterly financial information | Quarters ended September 30, 2012, June 30, 2012 and March 31, 2012 and each quarter in the year ended December 31, 2011 |

| Management's discussion and analysis of financial condition and results of operations | As of and for the years ended December 31, 2011 and 2010 |
|---|---|

30.   On April 11, 2013, Ixia issued a press release announcing that as a result of the accounting errors:

> Management currently expects revenues in the first quarter of 2013 to be in the range of $121 million to $123 million, below its prior revenue guidance of $125 million to $127 million. Management's updated revenue expectations exclude $4.15 million that the Company previously expected to recognize in the 2013 first quarter but has now recognized in prior periods that have been restated to correct certain revenue recognition practices including with respect to an implied warranty arrangement with a customer that resulted in the $4.15 million not being recognized during the 2013 first quarter. The updated range reflects the Company's previous guidance, as adjusted for the $4.15 million in revenue that has been recognized in prior periods.

31.   On May 9, 2013, Ixia filed with the SEC a Form 8-K disclosing that on May 3, 2013, the Company's independent auditor PricewaterhouseCoopers LLP ("PWC") had notified Ixia of its decision to decline to stand for re-appointment as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2013.  In its attestation report in the 2012 10-K, PWC also reported that, in its opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2012.  The Audit Committee discussed these matters with PWC, and the Company authorized PWC to respond fully to any inquiries by its successor once that firm has been appointed by the Audit Committee.

32.   On July 8, 2013, Ixia announced that "[t]otal revenue for the second quarter of 2013 is expected to be in the range of $114 million to $116 million, below the company's previous guidance of $119 million to $122 million."

33.   On October 24, 2013, Ixia announced that defendant Alston had resigned as President and CEO of the Company following a determination by the Audit Committee that although he had attended Stanford University, he had

misstated his academic credentials, incorrectly claiming to have received a B.S and a M.S. in Computer Science, and had misstated his age and early employment history.

34.     On November 13, 2013, the Company filed with the SEC a Form 12b-25 in which the Company disclosed that it would be unable to timely file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2013 because as a result of defendant Alston's resignation, the Audit Committee, with the assistance of independent counsel, was forced to conduct an email review and perform additional procedures to ensure the accuracy of its recording of financial information and appropriateness of its financial reporting.

35.     On November 19, 2013, Ixia received a notice from NASDAQ stating that because the Company had not yet filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2013, the Company no longer complied with the Nasdaq Listing Rules and specifically with Nasdaq Listing Rule 5250(c)(1).  The Company expected to file the Form 10-Q by the extended deadline of November 18, 2013. As the Company announced in a press release issued on November 18, 2013, however, the Company was unable to file the Form 10-Q by the extended deadline.

36.     On March 3, 2014, defendant Miller submitted his resignation, effective March 3, 2014, as CFO of Ixia.

37.     On April 17, 2014, the Company filed with the SEC a Form 8-K in which the Company disclosed that it would need to restate "previously issued condensed consolidated financial statements contained in its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2013 and June 30, 2013."   More specifically, the Form 8-K stated:

> As reported in a Current Report on Form 8-K filed by Ixia ("Ixia" or the "Company") with the Securities and Exchange Commission (the "SEC") on March 5, 2014 (the "March Form 8-K"), on February 26, 2014, the Audit Committee of the Company's Board of Directors (the "Audit Committee") completed an internal investigation which included performing procedures to assess the Company's recording of financial transactions and the corresponding impact on the Company's

financial reporting. Through the internal investigation and the Company's own internal accounting review, the Company identified certain errors, as described below in this Item 4.02(a).

After accumulating and evaluating the identified errors, on April 11, 2014, *the Company's management and the Audit Committee concluded that the Company's previously issued condensed consolidated financial statements contained in its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2013 and June 30, 2013 should no longer be relied upon, and should be restated* due to the following errors:

- For certain sales transactions, the Company entered into an extended maintenance and warranty arrangement that included a fixed fee to cover products owned by the customer at the date of execution of the arrangement as well as extended maintenance and warranty coverage for any additional products purchased by the customer over the multi-year term of the applicable arrangement. The Company improperly recognized product revenues when the additional products were shipped rather than deferring a portion of the consideration and recognizing the related revenues over the remaining term of the applicable fixed fee, multi-year extended maintenance and warranty arrangement.

- For certain other sales transactions, the Company recognized product revenues prematurely (i) in advance of delivering certain product functionality or other deliverables that were committed to be provided to the customers or (ii) due to an incorrect assessment of certain multiple-element arrangement sales transactions which included professional services that were provided based on a purchase order separate from the product purchase order but that were negotiated concurrently with the customer.

- The Company entered into a sales arrangement that included extended payment terms beyond the Company's customary terms. Revenue for this transaction was incorrectly recognized when the products were shipped but should have been recognized when the payments became due.

*The correction of the errors is expected to reduce total revenues by approximately $2.0 million and $4.5 million for the quarters ended March 31, 2013 and June 30, 2013, respectively. Further, the correction of the errors is expected to increase deferred revenues by approximately $2.0 million and $6.5 million as of*

*March 31, 2013 and June 30, 2013, respectively.* The Company's restated condensed consolidated financial statements for the affected periods will also reflect the correction of errors related to the income tax effects of the revenue errors, as well as the correction of certain other tax items. The restatement will result in revenue recognition timing differences between quarterly periods and will not have any impact on the total revenue to be recognized over the life of the applicable arrangements. As part of the restatement process, the Company is continuing to assess the estimated errors identified above and will assess any other potential identified errors for correction as needed.

The Company plans to amend its previously filed Quarterly Reports on Form 10-Q for the quarters ended March 31, 2013 and June 30, 2013 as soon as practicable and at or about the same time the Company files its Quarterly Report on Form 10-Q for the quarter ended September 30, 2013 (the "Third Quarter Form 10-Q") and its Annual Report on Form 10-K for the fiscal year ended December 31, 2013 (the "2013 Form 10-K").

In connection with the restatement of the Company's previously issued condensed consolidated financial statements for the quarters ended March 31, 2013 and June 30, 2013, the Company's management has reassessed its evaluation of the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting as of each of March 31, 2013 and June 30, 2013. *Based on such reassessment and review, management has concluded, and the Company expects to report in its amended filing for each quarter, that due to the identified errors and material weaknesses identified in the Company's internal controls, the Company did not maintain effective disclosure controls and procedures or effective internal control over financial reporting as of either March 31, 2013 or June 30, 2013.*

(Emphasis added).

## FALSE AND MISLEADING STATEMENTS

38. The Individual Defendants were responsible for disseminating numerous false misleading statements concerning the Company's internal controls and financial results during the Company's fiscal years 2010 through 2013. In particular, the Individual Defendants knowingly caused or allowed the Company to:

  a. repeatedly assure stockholders that the Company's internal controls were adequate and effective, when the Individual Defendants knew that was not true; and

b. report quarterly and annual financial results the Individual Defendants knew were materially inaccurate as a result of the Company's accounting improprieties.

39. The Individual Defendants knowingly caused or allowed the Company to issue the foregoing false and misleading statements in press releases, Form 10-Q filings, Form 10-K filings, and conference calls from 2010 through 2013, including the following:

- April 29, 2010 press release and conference call;
- August 6, 2010 Form 10-Q filing, which was signed and certified by defendants Bhatnagar and Miller;
- October 21, 2010 press release and conference call;
- November 5, 2010 Form 10-Q filings, which was signed and certified by defendants Bhatnagar and Miller;
- February 3, 2011 press release and conference call;
- March 4, 2011 Form 10-K filing, which was signed by defendants Bhatnagar, Miller, Ginsberg, Rager, Hamilton, Fram, and Asscher and certified by defendants Bhatnagar and Miller;
- April 21, 2011 press release and conference call;
- May 6, 2011 Form 10-Q filing, which was signed and certified by defendants Bhatnagar and Miller;
- July 21, 2011 press release and conference call;
- August 5, 2011 Form 10-Q filing, which was signed and certified by defendants Bhatnagar and Miller;
- October 20, 2011 press release and conference call;
- November 7, 2011 Form 10-Q filing, which was signed and certified by defendants Bhatnagar and Miller;
- January 10, 2012 press release;
- February 2, 2012 press release and conference call;
- March 5, 2012 Form 10-K filing, which was signed by defendants Bhatnagar, Miller, Ginsberg, Rager, Hamilton, Fram, and Asscher and certified by defendants Bhatnagar and Miller;
- April 19, 2012 press release and conference call;
- May 2, 2012 Form 10-Q filing, which was signed and certified by defendants Bhatnagar and Miller;

- July 26, 2012 press release and conference call;

- August 7, 2012 Form 10-Q filing, which was signed and certified by defendants Alston and Miller;

- October 24, 2012 press release and conference call;

- November 8, 2012 Form 10-Q filing, which was signed and certified by defendants Alston and Miller;

- January 14, 2013 press release;

- February 6, 2013 press release and conference call;

- April 11, 2013 press release;

- April 30, 2013 press release and conference call;

- May 10, 2013 Form 10-Q filing, which was signed and certified by defendants Alston and Miller;

- July 8, 2013 press release;

- July 30, 2013 press release and conference call;

- August 9, 2013 Form 10-Q/A filing, which was signed and certified by defendants Alston and Miller; and

- August 9, 2013 Form 10-Q filing, which was signed and certified by defendants Alston and Miller.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

40.    During the relevant period, the Individual Defendants were well aware of the problems with the Company's lack of adequate internal controls and its deficient accounting and financial reporting practices, procedures, and systems. Through their attendance at Board, Audit Committee and management meetings; their review of the Company's financial statements; and conversations with the Company's management, auditors, and consultants, the Individual Defendants knew Ixia lacked adequate accounting and financial reporting systems as described herein, yet they declined to implement the necessary systems and expertise.

41.    In breach of both their fiduciary duty of loyalty and, with respect to the members of the Audit Committee, their responsibilities pursuant to the Audit Committee Charter, the Individual Defendants willfully ignored the deficiencies in

the Company's accounting and financial reporting systems and failed to make a good faith effort to address them.

42. The Individual Defendants further breached their fiduciary duties by knowingly disseminating to the public materially false and misleading statements concerning the Company's financial results and internal controls.

43. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, Ixia has sustained significant damages, including, but not limited to, costs incurred in connection with the investigation and remediation of the Company's inadequate internal controls and the multi-year restatement of its historical financial statements.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

44. Plaintiff brings this action derivatively and in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

45. Plaintiff is a stockholder of Ixia, was a stockholder of Ixia at the time of the wrongdoing alleged here, and has been a stockholder of Ixia continuously since that time.

46. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

47. As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

48. The Board currently consists of four directors: defendants Ginsberg, Asscher, Fram, and Hamilton, three of whom (Asscher, Fram, and Hamilton) are also members of the Audit Committee. As alleged herein, these defendants knowingly caused or recklessly allowed the Company consistently to misrepresent its financial

results and the adequacy and effectiveness of its internal controls, and deliberately declined to ensure that the Company maintained adequate controls over its internal accounting and financial reporting functions, and therefore they each face a substantial likelihood of being held liable for their misconduct. Accordingly, there is a reasonable doubt that defendants Ginsberg, Asscher, Fram and Hamilton can disinterestedly consider a demand to institute and vigorously prosecute this action.

## COUNT 1

### Against the Individual Defendants For Breach of Fiduciary Duty

49.     Plaintiff incorporates by reference each and every allegation set forth above, as though fully set forth herein.

50.     Each of the Individual Defendants was a director and/or officer of Ixia during the relevant period. Accordingly, each of the Individual Defendants owed the Company the utmost duties of good faith and loyalty.

51.     The Individual Defendants breached these fiduciary duties by knowingly failing to ensure that the Company implemented and maintained adequate controls over its accounting and financial reporting functions and by knowingly disseminating to stockholders materially false and misleading statements concerning the Company's financial results and internal controls, as alleged herein.

52.     By reason of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

C.     Awarding to Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees, accounts' fee and experts' fees, costs, and expenses; and

1         D.    Granting such other and further relief as this Court deems just and
2             proper.

Dated: May 5, 2014               Respectfully submitted,

**ROSMAN & GERMAIN LLP**

Daniel L. Germain (Bar No. 143334)
16311 Ventura Boulevard, Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Eric L. Zagar (Bar No. 250519)
Robin Winchester
Matthew A. Goldstein
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiff*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury.

Dated: May 5, 2014

Respectfully submitted,

**ROSMAN & GERMAIN LLP**

Daniel L. Germain (Bar No. 143334)
16311 Ventura Boulevard, Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

**KESSLER TOPAZ**
 **MELTZER & CHECK, LLP**
Eric L. Zagar (Bar No. 250519)
Robin Winchester
Matthew A. Goldstein
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiff*

## VERIFICATION

I, Mary E. Schaaf, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 5/2/14

Mary E. Schaaf, Secretary of the Board of Trustees
for Erie County Employees' Retirement System

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| ERIE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of Nominal Defendant IXIA <br><br> *Plaintiff(s)* <br><br> v. <br><br> VICTOR ALSTON, ERROL GINSBERG, LAURENT ASSCHER, JONATHAN FRAM, GAIL HAMILTON, JON RAGER, ATUL BHATNAGAR, THOMAS B. MILLER and IXIA <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) )  Civil Action No. **CV14-3468** ABC-Ex |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Daniel L. Germain, Rosman & Germain LLP, 16311 Ventura Blvd., Suite 1200, Encino, CA 91436-2152

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:   **MAY - 5 2014**

*Signature of Clerk or Deputy Clerk*

1184

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

ERIE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of Nominal Defendant IXIA

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

VICTOR ALSTON, ERROL GINSBERG, LAURENT ASSCHER, JONATHAN FRAM, GAIL HAMILTON, JON RAGER, ATUL BHATNAGAR, and THOMAS B. MILLER

**(b)** County of Residence of First Listed Plaintiff   Erie, Pennsylvania
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Los Angeles
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.

Rosman & Germain LLP, 16311 Ventura Blvd., Suite 1200, Encino, CA 91436-2152
(818) 788-0877

Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☐ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT:** $ in excess of 75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. section 1332(a)(2)

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☒ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number:

CV14-3468

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| ☐ Yes  ☒ No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | | Western |
| | ☐ Orange | | Southern |
| | ☐ Riverside or San Bernardino | | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| ☐ Yes  ☒ No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | **A PLAINTIFF?**<br>Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?**<br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of defendants reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | WESTERN |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?   ☐ NO   ☒ YES

If yes, list case number(s):   Santore v. IXIA, 13-cv-08440-MMM (SHx)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

---

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____   DATE:   May 5, 2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |